## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUSTIN BREAULT, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>NBCUNIVERSAL MEDIA, LLC,<br><br>        Defendant. | CASE NO. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>(JURY TRIAL DEMANDED) |

On behalf of himself and all others similarly situated, Plaintiff Justin Breault complains and alleges as follows based on personal knowledge as to himself, the investigation of his counsel, and information and belief as to all other matters, and demands trial by jury. Plaintiff believes that substantial evidentiary support will exist for the allegations in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      To supplement its revenues, Defendant NBCUniversal Media, LLC (hereinafter, "Defendant"), sells, rents, transmits, and/or otherwise discloses, to various third parties, records containing the personal information (including names and addresses) of each of its customers, along with detailed transactional information revealing the title and subject matter of the audiovisual material and service (i.e., the Golf Channel) purchased by each customer (collectively "Personal Viewing Information"). After Defendant discloses its customers' Personal Viewing Information, the various third-party recipients of this data then append to it a myriad of other categories of personal and demographic data pertaining to those customers, only to then re-sell that Personal Viewing Information (enhanced with the appended demographic information) to other third parties on the open market.

2.      Plaintiff brings this action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its customers' Personal Viewing Information in knowing violation of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

3.     The VPPA clearly prohibits what Defendant has done.  Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent,  any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), inter alia, liquidated damages in the amount of $2,500.00 per violation and equitable relief, *see id.* § 2710(c).

4.     Thus, while Defendant profits handsomely from its unauthorized sale, rental, transmission, and/or disclosure of its customers' Personal Viewing Information, it does so at the expense of its customers' privacy and their statutory rights under the VPPA because Defendant discloses its customers' Personal Viewing Information to third parties without providing prior notice to or obtaining the requisite consent from any of these customers.

5.     Defendant's practice of disclosing its customers' Personal Viewing Information in violation of the VPPA has invaded Plaintiff's and the other unnamed Class members' privacy and resulted in a barrage of unwanted junk mail to their home addresses and e-mail inboxes. Defendant's disclosures are also dangerous because they allow for the targeting of particularly vulnerable members of society.  For example, as a result of Defendant's disclosures of Personal Viewing Information, any person or entity could buy a list with the names, addresses, and telephone numbers of all women over the age of 50 who reside in New York, earn an income of over $80,000, own their home free and clear, and have purchased the Golf Channel from Defendant.  Such a list is available for sale for approximately $120.00 per thousand customers listed.

6.     In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitation of their customers' sensitive information. Defendant chose to disregard Plaintiff's and thousands of other consumers' statutorily protected privacy rights by releasing their sensitive data into the data-aggregation and brokerage marketplace.  Accordingly, on behalf of himself and the putative Class

defined below, Plaintiff brings this Complaint against Defendant for intentionally and unlawfully disclosing his Personal Viewing Information, *en masse*, in violation of the VPPA.

## JURISDICTION AND VENUE

7.      The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

8.      Personal jurisdiction and venue are proper because Plaintiff resides in Massachusetts and within this District; because Defendant transacted with Plaintiff in this District and regularly enters into transactions with consumers in Massachusetts and within this District; and because a substantial part of the unlawful conduct giving rise to Plaintiff's claims occurred in, was directed to, and/or emanated from within Massachusetts and this District.

## PARTIES

9.      Plaintiff is, and at all times alleged herein was, a natural person and citizen of Mansfield, Massachusetts.  During the relevant time period, including the two years preceding the filing of this action, Plaintiff purchased the "Golf Channel," a subscription-based video good or service broadcast via cable television, from Defendant.

10.     Defendant is a Delaware corporation with its principal place of business in New York, New York.  Defendant does business throughout Massachusetts and across the United States.  Defendant is a mass media and entertainment conglomerate and owner of the Golf Channel.

## VIDEO PRIVACY PROTECTION ACT

11.     In 1988, leading up to the VPPA's enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.*  Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials.  As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored

in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

12.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).  Thus, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id*.

13.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

14.     One former senator may have summarized it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

---

[1]     The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[2]     Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, frank.senate.gov (Jan. 31, 2012).

CLASS ACTION COMPLAINT

15.     In this case, however, Defendant chose to deprive Plaintiff and the unnamed Class members of that right by systematically disclosing their Personal Viewing Information to various third parties, without providing notice to (let alone obtaining consent from) anyone, as explained in detail below.

## BACKGROUND FACTS

### I.     Consumers' Personal Information Has Real Market Value

16.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

17.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[4]

18.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[5]

19.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators

---

[3]     FCC, *The Information Marketplace* (Mar. 13, 2001), at 8-11, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[4]     *See Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited May 13, 2019).

[5]     Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

CLASS ACTION COMPLAINT

then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

20.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

21.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

22.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

---

[6]    *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited May 13, 2019).

[7]    N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of- consumer-database-marketing.html (last visited May 13, 2019).

[8]    Letter from Sen. J. Rockefeller IV, Sen. Cmtee. on Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

[9]    *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

CLASS ACTION COMPLAINT

23.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[10] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Defendant share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

24.     Disclosures like Defendant's are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]  The FTC notes that "[t]she elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

25.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

---

[10]     *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited May 13, 2019).

[11]     C. Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times (May 20, 2007), *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited May 13, 2019).

[12]     *Id.*

[13]     *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf.

[14]     *Id.*

CLASS ACTION COMPLAINT

26.     Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in publishing industries.  Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.     Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

27.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding their personal information.

28.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

29.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

30.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

31.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private

---

[15]     *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited May 13, 2019).

[16]     *Id.*

[17]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited May 13, 2019).

CLASS ACTION COMPLAINT

data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

32.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### III.    Defendant Unlawfully Sells, Rents, Transmits, And Otherwise Discloses Its Customers' Personal Viewing Information

33.     Defendant maintains a vast digital database comprised of its customers' Personal Viewing Information, including the names and addresses of each customer and information reflecting the titles of all video and other audio-visual products that each of its customers have purchased.

34.     During the time period relevant to this action, Defendant has monetized this database by renting, selling, or otherwise disclosing its customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties.

35.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, the Personal Viewing Information of 13,089,254 American consumers who purchased Defendant's video products is offered for sale on the website of NextMark, Inc. ("NextMark") – one of many traffickers of this type of Personal Viewing Information – at a base price of "$85.00/M [per thousand records]" (8.5 cents each):

---

[18]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited May 13, 2019).

[19]     *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited May 13, 2019) ("It is obvious that people value online privacy.").

CLASS ACTION COMPLAINT



See **Exhibit A** hereto.

36.     The "Golf Cable Subscribers Mailing List" list offered for sale by NextMark, shown in the screenshot above, contains Personal Viewing Information for each of the 13,089,254 American consumers whose information appears on the list, including each person's name, postal

address, telephone number, gender, age, income, whether they have children, and their homeowner status, as well as the title of the video service/product they purchased.

37.     As a result of Defendant's data compiling and sharing practices, companies have obtained and continue to obtain the Personal Viewing Information of Defendant's customers, together with additional sensitive personal information that has been appended thereto by data appenders and others.

38.     Plaintiff is informed and believes, and thereupon alleges, that numerous of the third parties to whom Defendant has transmitted and/or otherwise disclosed its customers' Personal Viewing Information, either directly or indirectly through an intermediary or intermediaries, have in turn sold, rented, transmitted, or otherwise disclosed that Personal Viewing Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including other data brokers, data miners, data appenders, and marketing companies.

39.     Defendant's disclosures of Personal Viewing Information have put its customers at risk of serious harm from scammers.  For example, as a result of Defendant's disclosures of Personal Viewing Information, any person or entity could obtain a list with the names, addresses, and telephone numbers of all women over the age of 50 who reside in New York, earn an income of over $80,000, own their home free and clear, and have purchased the Golf Channel from Defendant.  Such a list is available for sale for approximately $120.00 per thousand customers listed.

40.     Defendant does not seek its customers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being sold, rented and exchanged on the open market.

41.     By disclosing its customers' names, addresses, and detailed video purchase information – which can collectively "reveal intimate facts about our lives"[20] – Defendant has intentionally and knowingly disclosed its customers' Personal Viewing Information to third parties without their informed written consent, in direct violation of the VPPA.

## PLAINTIFF'S EXPERIENCE

42.     Plaintiff Justin Breault has, during the past 24 months, purchased a subscription-based video good or service broadcast via cable television, i.e., the "Golf Channel," from Defendant.

43.     Prior to and at the time he purchased this subscription-based video good or service broadcast via cable television from Defendant, Defendant did not notify Plaintiff that it would disclose the Personal Viewing Information of its customers generally or of Plaintiff in particular, and Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to third parties.  Plaintiff has never been provided any written notice that Defendant sells, rents, licenses, exchanges, or otherwise discloses its customers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information.

44.     Defendant nonetheless sold, rented, transmitted and/or otherwise disclosed, either directly or through an intermediary or intermediaries, Plaintiff's Personal Viewing Information – including, inter alia, Plaintiff's name, postal address, telephone number, gender, age, income, whether he has children, and his homeowner status, as well as the title of the video service/product Plaintiff purchased – to data miners, data appenders, data aggregators, marketing companies, and/or other third parties, including without limitation NextMark, during the relevant time period.

45.     Plaintiff is informed and believes, and thereupon alleges, that third parties to whom Defendant transmitted and/or otherwise disclosed his Personal Viewing Information, including without limitation NextMark, have in turn sold, rented, transmitted, and otherwise disclosed his

---

[20]     California's Reader Privacy Act Signed into Law, EFF (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited May 14, 2019).

Personal Viewing Information (together with other sensitive personal demographic and lifestyle information appended thereto by data appenders and other entities) to other third parties, including but not limited to other data brokers, data miners, data appenders, and marketing companies.

46.     As a result of Defendant's sales, rentals, transmissions, and/or other disclosures of Plaintiff's Personal Viewing Information to third parties, Plaintiff now receives junk mail from various companies and other organizations that do not offer products or services through the mail. These unwarranted and harassing junk mailings, which are attributable to Defendant's unauthorized sale, rental, and/or other disclosure of his Personal Viewing Information, have wasted Plaintiff's time, money, and resources.

47.     Because Plaintiff is entitled by law to privacy in his Personal Viewing Information, and paid money for the videos he purchased from Defendant, Defendant's disclosure of his Personal Viewing Information deprived Plaintiff of the full set of benefits to which he was entitled as a part of his purchases, thereby causing him economic harm.  Accordingly, what Plaintiff received (videos without statutory privacy protections) was less valuable than what he paid for (videos with statutory privacy protections), and he would not have been willing to pay as much, if at all, for the videos he purchased from Defendant had he known that Defendant would disclose his Personal Viewing Information. Plaintiff did not discover that Defendant sold, rented, transmitted, and/or otherwise disclosed his Personal Viewing Information until August 2020.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of himself and a class of similarly situated residents (the "Class"), defined as follows:

> All persons in the United States who, at any time during the applicable statutory period, had their Personal Viewing Information disclosed to a third party by Defendant.

49.     Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

50.     Members of the Class are so numerous that their individual joinder herein is impracticable, as they number, on information and belief, in the hundreds of thousands. The precise number of members of the Class and their identities are unknown to Plaintiff at this time, but such information may readily be determined through discovery. Members of the Class may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

51.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class. Common legal and factual questions include, but are not limited to: (1) whether Defendant unlawfully disclosed and continues to unlawfully disclose Plaintiff's and the Class's Personal Viewing Information in violation of the VPPA; (2) whether Defendant's disclosures were committed knowingly; (3) whether Defendant obtained the requisite consent before disclosing Plaintiff's and the Class's Personal Viewing Information; (4) whether Defendant was unjustly enriched by its disclosures of Plaintiff's and the Class's Personal Viewing Information; and (5) whether Defendant violated Plaintiff's and the Class's rights to privacy.

52.     The claim of the named Plaintiff is typical of the claims of the Class in that the Plaintiff, like all unnamed Class members, sustained damages as a result of Defendant's uniform wrongful conduct in disclosing his Personal Viewing Information.

53.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

54.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class. Individual members of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases

the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**COUNT ONE**
**VIOLATION OF THE VPPA (18 U.S.C. § 2710)**
(Brought by Plaintiff Individually and
on Behalf of the Class Against Defendant)

55.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     Defendant is a "video tape service provider as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery or prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it sells and delivers prerecorded subscription-based video goods or services broadcast via cable television (i.e., "similar audio visual materials" under the VPPA's definition), to consumers across the United States.

57.     The subscription-based video good or service broadcast via cable television that was sold by Defendant and purchased by Plaintiff and the Class members – i.e., the "Golf Channel" – constitutes an "audio visual material" that is "similar" to a "prerecorded video cassette tape" within the meaning of 18 U.S.C. § 2710(a)(4).

58.     Plaintiff is a "consumer" as defined by the VPPA because he "purchase[d]  . . . goods" or "services," i.e., prerecorded subscription-based video goods or services broadcast via cable television, "from [Defendant,] a video tape service provider," 18 U.S.C. § 2710(a)(1), during the 24-month period preceding the filing of this action.

59.     At various times relevant to this action, including subsequent to Plaintiff's purchase of subscription-based video goods or services broadcast via cable television (i.e., the "Golf Channel") from Defendant within the preceding 24-month period, Defendant disclosed Plaintiff's Personal Viewing Information, including Plaintiff's name, postal address, telephone number, gender, age, income, whether he has children, and his homeowner status, as well as the title of the video service/product Plaintiff purchased, to various third parties, including data aggregators, data appenders, and marketing companies, including without limitation NextMark.

60.     Defendant's disclosures of Plaintiff's Personal Viewing Information to third parties, including without limitation to NextMark, constituted "knowing[] disclosures" of "personal identifiable information concerning [Plaintiff]" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(b)(1).

61.     Plaintiff and the members of the Class never consented, in writing or otherwise, expressly or otherwise, to Defendant disclosing their Personal Viewing Information to anyone. Worse yet, Plaintiff and the members of the Class did not even receive notice before Defendant disclosed their Personal Viewing Information to third parties.

62.     Defendant's disclosures of Plaintiff's and the Class's Personal Viewing Information were not made pursuant to lawful compulsion.  Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures were not necessary for "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership." 18 U.S.C. § 2710(a)(2).

63.     Defendant's disclosures of Plaintiff's and the Class's Personal Viewing Information were made to various third parties – including, but not limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers, marketers, other third parties, and anyone else willing to pay for it – in order to increase Defendant's corporate revenues.

64.     Plaintiff is informed and believe that third-party recipients of his Personal Viewing Information, which was disclosed to them by Defendant, thereafter appended to Plaintiff's Personal Viewing Information additional categories of sensitive information from their own

databases and re-disclosed this "enhanced" Personal Viewing Information to other third parties, including on behalf of Defendant. Because the lists of Personal Viewing Information disclosed by Defendant and redisclosed by other downstream entities on its behalf included additional information appended by data aggregators and appenders, these "enhanced" lists of Personal Viewing Information were more valuable, and Defendant and the other third-party traffickers of such data were able to increase their profits gained from the rentals and/or exchanges of such lists, including those containing Plaintiff's and the Class's Personal Viewing Information.

65. By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the unnamed Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

66. Defendant's disclosures of Plaintiff's Personal Viewing Information to third parties has also caused an influx of third-party print advertisements and e-mail spam to his postal mailbox and e-mail inbox.

67. Additionally, because Plaintiff and the members of the Class paid Defendant for the videos they purchased from Defendant, and because Defendant was obligated to comply with the VPPA, Defendant's unlawful disclosure of Plaintiff's and the other Class members' Personal Viewing Information deprived Plaintiff and the Class members of the full value of their paid-for videos. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Viewing Information, Defendant's unlawful sales, rentals, transmissions, and/or other disclosures of their Personal Viewing Information caused them to receive less value than they paid for, thereby causing them economic harm. Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Viewing Information, a purchase of videos from Defendant that includes privacy protections for their Personal Viewing Information is more valuable than one that does not. Accordingly, had Plaintiff been adequately informed of Defendant's disclosure practices, he would not have been willing to purchase the videos that he bought from Defendant at the prices charged, if at all. Thus, Defendant's unlawful disclosures caused Plaintiff economic harm.

68.     As a result of Defendant's unlawful disclosures of their Personal Viewing Information, Plaintiff and the members of the Class have suffered privacy and economic injuries. On behalf of himself and the Class, Plaintiff seeks: (1) an injunction requiring Defendant to obtain consent from its customers prior to disclosing their Personal Viewing Information as required by the VPPA, 18 U.S.C. § 2710(c)(2)(D); (2) $2,500.00 per violation of the VPPA to Plaintiff and Class members, and punitive damages in an amount to be determined at trial, *id.* § 2710(c)(2)(A)-(B); and (3) costs and reasonable attorneys' fees pursuant to the VPPA, *id.* § 2710(c)(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Justin Breault seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

C.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.     For Defendant to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

E.     For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

F.     For prejudgment interest on all amounts awarded;

G.     For an order of restitution and all other forms of equitable monetary relief;

H.     For injunctive relief as pleaded or as the Court may deem proper; and

I.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and the Class, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims so triable.

Dated: August 25, 2020

Respectfully submitted,

By: /s/ *James J. Reardon, Jr.*
    James J. Reardon, Jr. (BBO #566161)

**REARDON SCANON LLP**
JAMES J. REARDON, JR.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

**HEDIN HALL LLP**
FRANK S. HEDIN*
1395 Brickell Ave, Suite 1140
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-Mail: fhedin@hedinhall.com

**HEDIN HALL LLP**
DAVID W. HALL*
Four Embarcadero Center, Suite 1400
San Francisco, California 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058
E-Mail: dhall@hedinhall.com

**BURSOR & FISHER, P.A.**
JOSEPH I. MARCHESE*
PHILIP L. FRAIETTA*
888 Seventh Avenue
New York, New York 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com
      pfraietta@bursor.com

* Pro Hac Vice Application Forthcoming

*Counsel for Plaintiff and the Putative Class*

# EXHIBIT A

 Start   Results   Data Card   Request   Finished

# EXHIBIT A

# Golf Cable Mail Order Buyers Mailing List

Audience Profile These avid golfers have paid a single premium price each month to receive the Golf Channel. Their subscription is not part of a "blanket buy" of multiple sports programming (FOX Sports, ESPN, etc.). They watch the golf channel an average of 8.5 hours each week and have responded to offers advertised on the golf channel.

[ Get Count ]  [ Get Pricing ]  [ Get More Information ]

| SEGMENTS | | *COUNTS THROUGH 08/01/2020* |
|---|---|---|
| 3,957,256 | TOTAL UNIVERSE / BASE RATE | $90.00/M |
| 3,957,255 | 12 MONTH GOLF MAIL ORDER BUYERS | $90.00/M |
| 94,000 | 30 DAY FEMALE GOLF MOBS | + $5.00/M |
| 67,000 | 30 DAY GOLF VACATION RESPONDERS | + $5.00/M |
| 71,000 | 30 DAY INSTRUCTION/GOLF SCHOOL RESPONDERS | + $5.00/M |
| 45,000 | 30 DAY EQUIPMENT INFOMERCIAL BUYERS | + $5.00/M |
| 332,000 | 30 DAY GOLF MOBS | + $5.00/M |
| 1,126,458 | 12 MONTH FEMALE GOLF MOBS | + $5.00/M |
| 802,065 | 12 MONTH GOLF VACATIONS | + $5.00/M |
| 844,691 | 12 MONTH INSTRUCTION/GOLF SCHOOL | + $5.00/M |
| 542,095 | 12 MONTH EQUIPMENT INFOMERCIAL BUYERS | + $5.00/M |

| MARKET: | CONSUMER |
|---|---|
| CHANNELS: | |
| SOURCE: | GOLF CABLE PROGRAMMING |
| PRIVACY: | UNKNOWN |
| DMA?: | NO |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |

| SELECTS | |
|---|---|
| AGE | $5.00/M |
| GENDER | $5.00/M |
| HOMEOWNERS | $5.00/M |
| INCOME | $5.00/M |
| PHONE NUMBER | $15.00/M |
| PRESENCE OF CHILDREN | $5.00/M |
| STATE/SCF/ZIP | $5.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $2.50/M |
| CARTRIDGE | $25.00/F |
| DISKETTE | $35.00/F |
| E-MAIL | $35.00/F |
| MAGNETIC TAPE | $25.00/F |
| P/S LABELS | $7.50/M |

## DESCRIPTION

### Audience Profile

These avid golfers have paid a single premium price each month to receive the Golf Channel. Their subscription is not part of a "blanket buy" of multiple sports programming (FOX Sports, ESPN, etc.). They watch the golf channel an average of 8.5 hours each week and have responded to offers advertised on the golf channel.

### Terms and Conditions

**25% Commission to SRDS Brokers!**

Sample Mail Piece Required. Payment due 30 days from mail date. Cancellations after mail date are due in full. Net name arrangements negotiable based on volume.

### List Usage

Golf Card International

**Source:**  Golf Cable Programming

**Unit of Sale:**  $10.95-$19.95 Monthly

**RELATED LISTS**

- GOLF LIST, THE
- GOLF RESORT PLAYERS
- GOLF CABLE SUBSCRIBERS
- GOLF TIPS
- MASTERGRIP GOLF PRODUCT BUYERS
- GOLFWEEK
- AUSTAD'S GOLF PRODUCT BUYERS
- GREAT AMERICAN GOLF TOURS
- ST. ANDREW'S GOLF CLUB
- ST. ANDREWS GOLF CLUB BUYERS

**Minimum:** 5,000

**Updates:** Quarterly

### ORDERING INSTRUCTIONS

- To order this list, contact your List Broker and ask for NextMark List ID #86780 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 5,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- NET NAME IS ALLOWED
- EXCHANGE IS NOT AVAILABLE
- REUSE IS AVAILABLE

Get Count    Get Pricing    Get More Information